NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TURNER CONSTRUCTION COMPANY, INC., | : : : : |
| Plaintiff, | : **OPINION** : : Civ. No. 07-666 (WHW) |
| v. | : : |
| BRIAN TREMATORE PLUMBING & HEATING, INC., | : : : |
| Defendant. | : : : : |

**Walls, Senior District Judge**

      This dispute involves breach of contract and negligence claims arising out of a subcontract agreement (the "Subcontract") that Defendant, Brian Trematore Plumbing & Heating, Inc. ("BTPH"), entered into with Plaintiff, Turner Construction Company, Inc. ("Turner"), to perform certain plumbing work.  Turner moves for summary judgment on the First and Third Causes of Action in its Amended Complaint (Breach of Contract and Attorneys Fees) and to dismiss BTPH's Counterclaim seeking reformation of the Subcontract.  BTPH moves for summary judgment on its Counterclaim and to dismiss Turner's First and Third Causes of Action.  Pursuant to Fed. R. Civ. P. 78, the Court decides the motions without oral argument. The Court denies BTPH's motion for summary judgment.  The Court partially grants Turner's motion for summary judgment in that the Court grants Turner's motion to dismiss BTPH's

**NOT FOR PUBLICATION**

Counterclaim.  The Court denies Turner's motion for summary judgment on its First and Third Causes of Action.

## FACTS AND PROCEDURAL HISTORY

In February 2000, Turner agreed to act as general contractor for the construction of a residential apartment complex (the "Project") in Jersey City, New Jersey.  On April 4, 2001, Turner and BPTH entered into the Subcontract providing that BTPH would complete all plumbing work for the Project.

The Subcontract incorporated by reference various documents containing the drawings and specifications that BTPH was required to follow in performing its plumbing work.  One drawing, dated February 7, 2001, was designated P-400.  This drawing provided that copper tubing would be used for all cold water lines that were 4" in diameter or smaller and all hot water lines at the Project.  (Pl. Ex. G.)  Before issuing the February 7, 2001 drawing, Turner had previously issued to BTPH a preliminary drawing designated P-400, dated June 16, 2000, which similarly provided that copper tubing would be used for those cold and hot water lines.

The Subcontract provided that the Subcontractor "shall not make any changes, additions, and/or omissions in the Work except upon written order of Turner as provided in Article IX hereof."  (Ex. D.)  The Subcontract also provided that "[s]ubstitutions or deviations from the contract documents proposed by the Subcontractor and accepted by the Owner must be approved by the owner in a written change order."  (Ex. D.)  The Subcontract stated that work not conforming to the plans and specification "including substitutions not properly approved and

**NOT FOR PUBLICATION**

authorized, shall be considered defective" and "shall constitute a default by the Subcontractor." (Ex. D.)

In February 2002, BTPH submitted to Turner a proposal to use "Victaulic® Grooved End Fittings" (i.e., galvanized fittings) on the Project. (Trematore Decl. ¶ 8 and Ex. D.) BTPH argues that the submittal was a request for Turner to approve galvanized piping. BTPH argues that "[b]ecause the fittings are galvanized, the pipe they attach to must be galvanized as well." (Def. Counterstatement of Material Facts ¶ 9.) Turner contends that this was only a submittal for galvanized filings and not for galvanized piping. (Pl. Reply Br. at 4.) On March 1, 2002, Scott Kellerman, an on-site engineer working on the Project for Turner, asked Consenti Associates ("Consenti"), the Engineer of Record at the Project, to "review the submittal for galvanized, victualic piping for domestic water" and "advise if this is ok." (Trermatore Decl. Ex. D.) On March 6, 2002, Consenti approved the submittal "as noted." On March 7, 2002, Consenti sent a "Submittal Transmittal" to BTPH transmitting Mr. Kellerman's approval of "Galvanized (Victaulic) Water Piping 4", 5", 6"." (Trematore Decl. Ex. D.)

BTPH installed galvanized steel piping, rather than copper piping, for the 4" inch hot water and cold water lines at the Project. Approximately two and a half years after BTPH completed its work on the Project, leaks began occurring in some of the installed galvanized steel pipes due to corrosion of the pipes. The parties agree that some of the 4" galvanized pipe had "defective longitudinal seam welds" which contributed to the leaks in the pipes. Turner contends that the galvanized steel piping was defective and was the "direct and root cause" of the leaks at the Project. BTPH contends that defects in the piping were not the root cause of the leaks.

**NOT FOR PUBLICATION**

After the galvanized pipes failed, Turner asked BTPH to replace the 4" galvanized steel piping with 4" copper piping. BTPH refused to do so. Turner hired another company to replace the galvanized steel piping with copper piping.

On February 8, 2007, Turner sued BTPH, alleging that BTPH breached the Subcontract by installing galvanized steel piping where copper piping was required and failing to remove and replace the allegedly defective galvanized piping. (Compl. ¶¶ 16-17.) Turner alleges that the galvanized steel piping caused leaks in the Project's domestic water system and accelerated corrosion of the pipes. (Compl. ¶¶ 17, 19.) Turner alleges that it incurred damages in excess of $2.6 million. Turner later amended its Complaint to add a cause of action for negligence, alleging that BTPH "negligently substituted galvanized steel piping in place of the specified copper piping." (Amended Compl. ¶ 50.)

On June 8, 2007, BTPH filed a counterclaim against Turner. BTPH alleged that it had relied on the June 16, 2000 preliminary specifications in bidding on the project, and that those specifications did not require copper piping.[1] (Counterclaim ¶ 5.) BTPH also alleged that the galvanized steel piping was installed "under the close supervision of the Project Manager Fisher Development, and the Engineer of Record, Cosentini Associates." (Counterclaim ¶ 13.) BTPH alleged that it was never told while performing its plumbing work that installing the galvanized steel piping violated the subcontract. BTPH asks the Court to reform the Subcontract

---

[1] BTPH now admits that the June 16, 2000 preliminary specifications required copper piping. (Def. Response to Statement of Material Facts ¶ 31.)

-4-

**NOT FOR PUBLICATION**

to "accurately reflect the intention and conduct of the parties."[2]  (Counterclaim, Prayer for Relief.)

Turner now moves for partial summary judgment, asking the Court to find that BTPH is liable for breach of contract (First Cause of Action) and required to pay Turner attorneys fees and other litigation-related costs (Third Cause of Action).  Turner also asks the Court to dismiss BTPH's Counterclaim for reformation of the Subcontract.  BTPH also moves for summary judgment, asking the Court to dismiss the First and Third Causes of Action of Turner's Complaint and to grant its Counterclaim.

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, the dispute would affect the outcome of the suit.  See id. at 248.  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be

---

[2] A series of filings ensued in which additional parties from whom contribution and/or indemnification were sought were added to this action.  See Turner Constr. Corp. v. Brian Trematore Plumbing & Heating, Inc., No. 07-cv-666 (D.N.J. Oct.5, 2009).  On October 5, 2009, this Court severed all these third party claims from this action pursuant to Rule 21 of the Federal Rules of Civil Procedure.  The Court dismissed those claims without prejudice for lack of subject matter jurisdiction.

NOT FOR PUBLICATION

insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).  Upon a motion for summary judgment, the non-moving party, to prevail, must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

**I.     Turner's Breach of Contract Claim**

"Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her

**NOT FOR PUBLICATION**

legal rights and deliberately decided to relinquish them." Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 291 (1988). The intention to waive "need not be stated expressly, but may be spelled out from a state of facts exhibiting full knowledge of the circumstances producing a right and continuing indifference to exercise of that right." Merchants Indem. Corp. v. Eggleston, 68 N.J. Super. 235, 254 (App. Div. 1961). The New Jersey Supreme Court has set forth an "admonition that waiver issues, which turn on intent, should not be decided on a summary judgment basis." Garden State Bldgs., L.P. v. First Fidelity Bank, N.A., 305 N.J. Super. 510, 527 (App. Div. 1997) (citing Shebar, 111 N.J. at 291). See also 17B C.J.S. Contracts § 780 (1999) (noting that whether "performance has been accepted or defects or rights waived is a question of fact unless the evidence is uncontradicted and susceptible of but one inference.").

Estoppel is an affirmative defense that "requires the reliance of one party on another." Knorr v. Smeal, 178 N.J. 169, 177 (2003). To prevail on a claim of equitable estoppel, the claiming party must show that "the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment." Miller v. Miller, 97 N.J. 154, 163 (1984). See also Frick Joint Venture v. Starwood Ceruzzi Union, LLC, No. A-4234-04T1, 2006 N.J. Super. Unpub. LEXIS 19 (App. Div. Dec. 6, 2006) ( "A party to a written contract who has by some affirmative action led the other party to believe and act on that belief, that he will not be held to a strict performance of covenants, will be estopped in equity from requiring a strict

**NOT FOR PUBLICATION**

performance of that covenant.") (quoting <u>Aron v. Rialto Realty Co.</u>, 100 N.J. Eq. 513, 518 (Ch. 1927)).

A corporation may waive defective performance or be estopped from asserting certain rights through the acts and knowledge of its employees. "It is elementary law that the knowledge of an agent or employee within the sphere of his agency or employment will be imputed to the corporation." <u>In re Mifflin Chemical Corp.</u>, 123 F.2d 311, 315 (3d Cir. 1941). <u>See also</u> <u>MicroSignal, Corp. v. MicroSignal Corp.</u>, 147 Fed. Appx. 227, 231 (3d Cir. 2005) ("It is well-settled that . . . acts of a corporate agent which are performed within the scope of his authority are binding upon the corporate principle."). When an employee is not a director or high-level officer, the decision whether to impute that employee's knowledge and actions to the corporation is generally a question of fact. <u>See, e.g.</u>, <u>Hellenic Inc. v. Bridgeline Gas Distrib. LLC</u>, 252 F.3d 391, 395 (5th Cir. 2001) (whether to impute knowledge acquired by employees other than officers and directors "tends to be fact-intensive and contingent on the specific legal regimes involved").

BTPH argues that Tuner's approval in February 2002 of its submittal to use galvanized fittings was approval to use galvanized piping for the 4" lines at the project. BTPH argues that this approval was a modification of the Subcontract or, at the very least, a waiver of any contractual obligation to use copper piping for those lines. BTPH also argues that, while it was working on the Project, Turner was aware that it was using 4" galvanized steel piping. BTPH notes that the galvanized steel piping was "subject to multiple inspections – and in fact the pipes were exposed for months because the walls could not be closed up until multiple

NOT FOR PUBLICATION

inspections had taken place." (Def. Counterstatement of Material Facts ¶ 27.) BTPH argues that Turner's representatives were often present at these inspections. BTPH also argues that Mr. Kellerman, the on-site Turner engineer, stated in his deposition that he was aware that steel piping was being used, and that the owner of the project and Cosentini (the owner's engineer) were aware of this. BTPH asserts that it never heard any complaints about the use of the galvanized steel pipes until August 2006, two years after Turner made final payment. BTPH argues that Turner has waived the requirement that BTPH use copper piping for the 4" lines and that Turner is estopped from pursuing its current claims.

Turner counters that the Subcontract plainly required copper piping to be used for all 4" lines and BTPH did not do so. Turner argues that the Subcontract provides that it can only be amended by a "written change order" and here this was not done. Turner argues that, because BTPH used galvanized steel piping in violation of the Subcontract's provisions, Turner is entitled to summary judgment establishing BTPH's liability on its breach of contract claim.[3]

---

[3] Turner also argues that, on procedural grounds, BTPH cannot raise waiver as an affirmative defense because BTPH did not plead waiver as an affirmative defense in its Answer. (Pl. Opp. at 18.) BTPH counters that it plead equitable estoppel as an affirmative defense and, because the proofs for estoppel and waiver are "largely the same," Turner has not been prejudiced by BTPH's failure to raise waiver as a defense prior to discovery. The Court agrees with BTPH on this point. In the current context, the defenses of waiver and estoppel hinge on the same set of facts – whether Turner can no longer enforce the contractual requirement that BTPH use copper piping on the basis that its subsequent actions either (i) were in themselves a waiver of that requirement or (ii) led BTPH to believe that Turner was relinquishing that requirement. The overlap between the defenses of estoppel and waiver has been reflected in decisions by New Jersey courts. See, e.g., Aron, 100 N.J. Eq. at 513 (waiver will be operable when the act relied on as a waiver is "such as to estop a party from insisting on performance of the contract") (emphasis added).

**NOT FOR PUBLICATION**

The Court finds that genuine issues of material facts exist and preclude a grant of summary judgment to either party on Turner's breach of contract claim.  A reasonable jury may conclude either way as to whether BTPH's submittal in February 2002 to use galvanized fittings was a request to use galvanized piping for the 4" lines that Turner knowingly approved, thereby relinquishing its right to now complain that galvanized piping was used for those lines.  Similarly, a reasonable jury may conclude either way as to whether the facts support a conclusion that Turner waived (or is estopped form enforcing) any contractual right to copper piping on the grounds that Turner knew (or should have known) that BTPH used galvanized steel piping and Turner accepted that piping without protesting in a timely manner.  For instance, a reasonable jury may find that (i) Mr. Kellerman was aware that galvanized steel piping was used for the 4" lines, (ii) Mr. Kellerman's scope of responsibility included approving the payments for the materials used at the Project (in which case Mr. Kellerman's knowledge may be imputed to Turner) and (iii) Turner failed to protest the use of galvanized piping in a timely matter.[4]  Determining whether Turner has in fact waived (or should be estopped from enforcing) its contractual right to copper piping depends upon resolution of these types of factual inquiries that the Court cannot make at the summary judgment stage.

---

[4] Turner contends that Mr. Kellerman did not have the power to bind Turner, and Mr. Kellerman has attested that he was not authorized to modify any of the Subcontract's requirements (Kellerman Decl. ¶ 10). But a reasonable jury could find that, given the totality of the circumstances and Mr. Kellerman's level of at least apparent authority, if Mr. Kellerman observed that galvanized steel piping was used on the 4" lines, his failure (combined with the failure of any other Turner representative or inspector) to timely protest the use of that piping gives rise to a waiver or estoppel defense.

**NOT FOR PUBLICATION**

The waiver and agency issues that affect the outcome of this suit are fact-dependent questions upon which reasonable juries may differ in their findings. The Court will not rule on these questions at the summary judgment stage.

## II.     Turner's Request for Attorney Fees

Turner moves for summary judgment on its Third Cause of Action and asks the Court to find that BTPH is liable to pay its attorney fees and other litigation-related costs incurred in this action. BTPH moves for summary judgment asking the Court to dismiss Turner's Third Cause of Action.

The Court finds that Turner's request for attorney fees cannot be properly adjudicated until the Court determines whether Turner should prevail on its claim that BTPH defaulted on or breached the Subcontract. Because the Court finds that it cannot make this determination at the summary judgment stage, the Court must deny the motions by Turner and BTPH for summary judgment on Turner's Third Cause of Action.

## III.    Reformation of the Subcontract

BTPH moves for partial summary judgment asking the Court to grant its Counterclaim for reformation of the Subcontract. Turner moves for summary judgment asking the Court to dismiss the Counterclaim.

Reformation is an equitable remedy that makes an instrument "conform to the intention of the parties. It is applicable to cases of mistake and fraud. If there is mistake on one hand and fraud on the other, reformation is the option." Toth v. Vazquez, 8 N.J. Super. 289, 293 (App. Div. 1950). To reform a contract on the basis of a unilateral mistake, "the following

**NOT FOR PUBLICATION**

essential elements must each be present: (1) the mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to the material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and (4) the relief afforded must not seriously prejudice the other party, except for loss of his bargain." Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc., 913 F. Supp. 837, 842-43 (D.N.J. 1995). "Unconscionability exists where 'grossly disproportionate bargaining power' between the parties has resulted in 'grossly unfair contractual provisions.'" Fleming, 913 F. Supp. at 845 (quoting Jefferson Loan Co., Inc. v. Livesay, 175 N.J. Super. 470, 479 (1980).

The Court finds that BTPH has presented no evidence that Turner has fraudulently induced it to enter the Subcontract. BTPH has also not presented any evidence upon which a reasonable jury could find that it would be "unconscionable" to enforce the Subcontract as written. Brian Trematore, the President of BTPH, signed every page of the Subcontract, and the Subcontract specifically directed BTPH to look at various documents listing drawings, one of which was P-400, to find out the requirements for its plumbing work. No reasonable jury could find that Turner and BTPH had "grossly disproportionate bargaining power" or that the resulting contractual provisions were "grossly unfair."

## CONCLUSION

The Court denies BTPH's motion for summary judgment. The Court partially grants Turner's motion for summary judgment in that Turner's motion to dismiss BTPH's

**NOT FOR PUBLICATION**

Counterclaim is granted and the Counterclaim is dismissed with prejudice. Turner's request for summary judgment on the First and Third Causes of Action is denied.

October 9, 2009                                                     s/William H. Walls
                                                                    United States Senior District Judge